## BORMAN et al. v. SULLIVAN.
### No. 5285.

Circuit Court of Appeals, Seventh Circuit.
April 24, 1935.

Frank C. Rathje, Francis E. Hinckley, and Laurence V. Meyering, all of Chicago, Ill., for appellants.

Silas H. Strawn and Harold A. Smith, both of Chicago, Ill., for appellee.

Before EVANS, SPARKS, and FITZHENRY, Circuit Judges.

SPARKS, Circuit Judge.

Appellee by his bill of interpleader sought to require appellants, the Bormans, on the one hand, and Jackson and Curtis, a firm of stock and bond brokers, on the other, to interplead as to the ownership of and right of possession to two Liberty bonds, which had come into his possession as receiver of the Jefferson Park National Bank

of Chicago. The matter was submitted to the District Court upon a written stipulation of facts and exhibits. It was agreed that if the court should determine that Jackson and Curtis were entitled to the bonds it might without amendment or further pleadings consider and determine whether appellants were entitled to a preferred claim against the assets of the bank and enter its decree accordingly. The court awarded the bonds to Jackson and Curtis and disallowed appellants' claim as a preferred claim. The appeal is not from that portion of the decree which awarded the bonds to Jackson and Curtis, but only from that portion which denied a preference to appellants.

It was stipulated that the bank was voluntarily closed by its board of directors on June 22, 1932; that on June 25, 1932, R. C. Sullivan was appointed its receiver by the Comptroller of the Currency of the United States, and since that time has acted as such in its liquidation.

On and prior to June 17, 1932, appellants maintained a checking account with the bank, in which on the last named date there was a credit balance of $5,216.43. On that date Mrs. Borman requested the bank to purchase for her Fourth Liberty Loan 4¼% bonds of the par value of $2,000, and on the same day the bank ordered from Jackson and Curtis two $1,000 bonds of that description for the agreed market price of $2,065.98 which was to be paid to Jackson and Curtis upon delivery of the bonds. The order was confirmed by Jackson and Curtis on the same day, and that confirmation was received by the bank on June 18, 1932. On that day, appellant Arthur Borman drew a check on appellants' account in the bank in the sum of $2,068.48, which represented the purchase price plus a commission of $2.50. That check, which bears no date, was made payable and delivered to the bank on the date of its execution, and on the same day the bank executed its cashier's check, payable to Jackson and Curtis in the sum of $2,065.98. On June 20, 1932, the Borman check was charged to their account, their check was canceled, and their credit balance in the bank was decreased by that amount. On June 21, 1932, the cashier's check was delivered by the bank to Jackson and Curtis who in turn delivered the bonds to the bank. Jackson and Curtis deposited the cashier's check in the First National Bank of Chicago on June 21, 1932. On the following day it was endorsed "Paid through Chicago Clearing House." However, at noon of that day the Jefferson Park National Bank closed its doors, and the cashier's check when presented was dishonored, the paid stamp canceled and the amount charged back to the account of Jackson and Curtis. At the time the bank closed its doors it had in currency more than the amount of the cashier's check, and had also the bonds in question, all of which came into the possession of the receiver.

Appellants contend that the bank acted in the transaction as their agent, and held the amount checked to it in trust, and not as a general credit of appellants', and that it constituted no part of the general assets of the bank, the trust character of the fund remaining unaltered by the mingling of it with the general funds; that, as a result of the transaction, the assets of the bank were augmented by the amount of appellants' check; and that by reason of that augmentation the fund was traced into the bank's general cash assets, of which it was not properly a part. It was conceded in argument that there was no basis from which a trust ex maleficio could arise.

Under the facts stated, the court held there was no augmentation of the bank's assets, and we think that ruling was correct. Certainly they were not augmented by the receipt of the bonds, because the bonds never became a part of the assets. They were purchased by the bank from Jackson and Curtis on the condition that payment should be made in cash when delivered. Hence, title remained in Jackson and Curtis until cash payment was made. That was never done, and the court ordered them returned to Jackson and Curtis, and in that order appellants acquiesced.

We think it can not be successfully contended that the transaction resulted in the creation of a special deposit by appellants. True, appellants might have withdrawn the money on their check and redeposited it in trust, providing the bank was in condition and was willing to pay the check. But that is not what happened. A similar situation arose in Old Company's Lehigh, Inc., v. Meeker, 55 S. Ct. 392, 79 L. Ed. ——, decided by the Supreme Court February 4, 1935, and it was there held that no trust relationship was created. This court held to the same effect in Connolly v. Lang (C. C. A.) 68 F.(2d) 199, and Allied Mills v. Horton (C. C. A.) 65 F.(2d) 708, 90 A. L. R. 1. See, also, Wisdom v. Keen (C. C. A.) 69 F.(2d) 349.

344

Conceding without admitting that the bank's assets were augmented by the transaction, and that there was a trust created, yet we think appellants' contention must fail because no part of the so-called trust fund was traced into the hands of the receiver. The mingled funds were not ear-marked, and if the tracing of those funds into the receiver's hands is to be established it must be by virtue of the fact that at all times since the bank received the money in trust, it had enough currency on hand to equal the amount of the trust fund which it is claimed the receiver received. Appellants' check was delivered to the bank on June 18, 1932. It was not charged to appellants' account in the bank until June 20, 1932, and the bank was not closed until June 22, 1932. The stipulation is that when the bank was closed it had in its possession more than $2,065.98 in currency, which was paid to the receiver. The record does not disclose the status of the bank's currency account at any time between the time at which it is claimed the bank received the money in trust and the time it closed. The court can not indulge in the presumption that during that time the currency account remained sufficient to cover the claim or any part of it. However short the intervening time, it was possible that the currency account was depleted and replenished, and if it were once depleted there could be no tracing under the theory we are now discussing. St. Louis & S. F. R. R. v. Spiller, 274 U. S. 304, 47 S. Ct. 635, 71 L. Ed. 1060.

Decree affirmed.

FITZHENRY, Circuit Judge (dissenting).

The trial court held: "No trust was created between the bank and Borman by the transactions between them for the reason that the assets of the bank were not augmented by anything that was done. Therefore, Borman is not entitled to a preferred claim. Blakey v. Brinson, 286 U. S. 254 [52 C. St. 516, 76 L. Ed. 1089, 82 A. L. R. 1288]."

The bonds which the bank had purchased (or contracted for) for the Bormans were returned to Jackson & Curtis, for the reason that the cashier's check given and accepted as payment for them was not paid when presented to the bank because it had just been closed by the board of directors.

In this case Mrs. Borman had requested the bank's officers to purchase two $1,000 Liberty bonds. Later, the price of the bonds was agreed upon, and the tentative purchase was confirmed by mail from Jackson & Curtis to the bank on the 17th of June. Immediately the bank called in one of the Bormans, the amount of the purchase price of the bonds was stated, and the commission of the bank fixed. Mr. Borman then executed his check on appellants' checking account for the amount of the purchase, together with the commission to be paid to the bank for its services. This check was executed on June 18, 1932, and on the same day the bank's cashier's check was issued, but Borman's check was not paid through the bank until the 20th, and on that day the cashier's check was sent by messenger to the broker, who delivered the bonds to the messenger, who gave a receipt therefor. The next day the bank where the broker deposited the cashier's check put it through the clearing house and an agent of the clearing house reached the bank just after the board of directors had closed it. There was no fraud or misrepresentation about this transaction.

In the case of Blakey v. Brinson, supra, none of these facts appear. There had been nothing except a conversation between the depositor and banker generally concerning the purchase of some bonds. The respondent's deposit in the bank was in a savings account, where the debtor and creditor relation existed between the banker and depositor. On the next day, after an additional deposit had been made by Brinson bringing his balance up to $4,061.31, the officer of the bank informed respondent that the bonds had been ordered, and on the 19th of October said to him "I have your bonds," and handed him a large slip which stated:

"This is to advise you that we have this day charged your account as follows:

| | |
|---|---|
| 4,000 Fourth L. L. 4¼% Bonds | $3,960.00 |
| Acct. Int. | .60 |
| Commission | 4.00 |
| | $3,964.60 |

On October 21st the bank charged respondent's savings account on its books with $3,964.60 and credited a like amount as a "deposit" in a "bond account," which latter fact was unknown to Brinson for some time. This information with reference to the bonds was entirely false. No bonds had been ordered by the bank, none had been purchased at any price, nor had the charge to his general account been authorized by the depositor. In fact, the whole transac-

tion was imaginary, and the only authority for making the charge against Brinson's account was the assent after the fact, which was procured through false representations.

In other words, all that Brinson did was to have a conversation on the subject with the banker with no agreement, while in the Borman Case, when it was ascertained how much money it was going to require to purchase the bonds and pay the expense, Mr. Borman, who had an ample checking account with the bank, gave the banker his personal check for the full amount of the purchase price of the bonds and the commission of the bank for performing the services. The execution of the check was a plain token of an intent on the part of Borman to create a trust fund in the hands of the bank to be used for that purpose and was a complete divorcement of that much of his checking account from the debtor and creditor relation.

In the Blakey Case, supra, after reciting all of the facts, the court said: "We can find in this method of discharging a supposed obligation no hint of an intended alteration of the debtor and creditor relationship, with which respondent had been content from the beginning, to that of trustee and cestui que trust." While in this case the court could truthfully say: "We find in this method of discharging a supposed obligation every token of an intended alteration of the debtor and creditor relationship, with which respondent was not content, to that of trustee and cestui que trust."

The banker's books, as shown by the record, disclose that on June 20th the Bormans' checking account was reduced by the check given to the bank for the bond purchase to the extent of $2,068.48, leaving a balance in the checking account of $3,283.-90 when the bank closed. With that money the bank purchased from itself a cashier's check payable to Jackson & Curtis and sent it in payment for the bonds purchased. The amount of the check, exclusive of the $2.50 paid to the bank for its services, was the money of Bormans', to which the debtor and creditor relation did not apply, put in the hands of the bank to purchase the bonds in question. The bank's books, appellant's check, and the cashier's check are permanent monuments of the character and extent to which the bank's assets were augmented, at noon of the next day when the board of directors closed the bank. The stipulation of facts conclusively shows there

was considerably more than the amount of appellants' claim in the hands of the bank when it was closed and the receiver took charge.

The only question that has really been litigated in this case is whether or not the funds placed in the hands of the bank by appellants were impressed with a special purpose. As a matter of fact, there is no evidence to the contrary. Everything was done that could be done to create a special deposit. Instead of the case of Blakey v. Brinson, supra, being an authority against the appellants in this case, it is a strong one in support of their contention.